IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**ELIAS BUCARAM**                    )
                                     )
          Petitioner,                )
                                     )
     v.                              )     No. 06 C 3420
                                     )
**NEDRA CHANDLER,**                  )
                                     )
          Respondent.                )

## MEMORANDUM OPINION AND ORDER

Petitioner Elias Bucaram ("Bucaram") has brought a petition
pursuant to 28 U.S.C. § 2254 (2006) for a writ of habeas corpus.
At a bench trial in 2000 Bucaram was found guilty of aggravated
kidnapping and indecent solicitation of a child.  Bucaram received
concurrent sentences of 15 years for the two convictions.  Bucaram
is currently in the custody of the State of Illinois Department of
Corrections, and is incarcerated at the Dixon Correctional Center,
where respondent Nedra Chandler ("Chandler") is the warden.  For
the following reasons, I deny Bucaram's petition.

I.

A.  Evidence Presented at Trial

Rosita Villanueva ("Villanueva"), then seven years old, was
the first witness to testify at Bucaram's trial.  She testified in
Spanish with the assistance of an interpreter.  *People v. Bucaram*,
No. 99 CR 11735, Report of Proceedings, at A-9 (July 18, 2000).
She testified that on May 1, 1999, she was in Mozart Park in

Chicago (the "park") looking for a friend when she noticed Bucaram running near her. *See People v. Bucaram*, No. 1-01-0165, slip op. at 1-2 (Ill. App. Ct. Oct. 31, 2002).[1] Villanueva testified that Bucaram asked her if she wanted to go to his house, but she said no. *Id.* at 2. Bucaram took her hand and did not let go of it as he took her to his house; Villanueva did not want to go but did because she was "scared."[2] *Id.* Once inside Bucaram's basement apartment, Villanueva began to cry and initially refused Bucaram's offer of a toy. *Id.* During the time that Villanueva was in his apartment, Bucaram, who spoke in Spanish, asked her if she wanted to "make love" to him,[3] told her that "little girls could also do it" and put a movie on that depicted "three women without any

---

[1]This factual summary is drawn primarily from the summary the Illinois appellate court set forth in ruling on Bucaram's direct appeal. Factual determinations made by the Illinois state courts are presumed to be correct. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) (citing 28 U.S.C. §§ 2254(d)(2), (e)(1)). Bucaram has challenged certain aspects of the appellate court's summary; I have reviewed a transcript of Bucaram's trial proceedings and address his challenges below. In addition, certain of Bucaram's claims relate to issues not addressed in the appellate court's summary; I have included additional facts where relevant to Bucaram's claims.

[2]When asked on cross-examination why she was scared, Villanueva testified that she was scared "that he would hit me." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-32.

[3]Villanueva, testifying in Spanish, stated on cross-examination that Bucaram asked her "if I wanted to make love to him." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-15. Counsel for Bucaram then asked the interpreter to "state in Spanish the phrase that was stated" and the witness responded, "He said hacer amor." *Id.*

clothes on." *Id.* After Villanueva again asked to leave, Bucaram grabbed her hand, told her "not to tell her mother," asked Villanueva to "kiss him in the mouth" and gave her a toy. *Id.* Bucaram then let her leave to go to the park. *Id.* Villanueva testified that after she returned to the park and spoke with the police, she showed the police where Bucaram had taken her and she identified Bucaram as the man who had taken her. *Id.* at 3.

Tanya Velez ("Velez") also testified at Bucaram's trial. She testified that while she was at the park on May 1, 1999, a park employee told her to go get "a little girl," referring to Villanueva. *Id.* She saw Villanueva with Bucaram (whom she later identified in a lineup) and approached and told her that the park employee wanted to see her. Velez testified that at this time Bucaram said "no" and grabbed Villanueva's hand, not letting go. *Id.* Velez further testified that Villanueva looked scared. *Id.*

The park employee Velez referenced in her testimony, Jerry Flores ("Flores") also testified at Bucaram's trial that on the morning of May 1, 1999 he saw a "short Hispanic man" approach Villanueva and try to touch her, but that Villanueva appeared frightened and pulled away. *Id.* at 4. Flores was not able to leave his work location and asked Velez to find out if Villanueva was in trouble; he observed Velez have a short conversation with Villanueva and Bucaram. *Id.*

Detective Karen Salvi ("Salvi") testified that she worked on Villanueva's case, and that on May 1, 1999, she went to a hospital and spoke with other police officers, Villanueva, and Villanueva's doctor. *Id.* Villanueva then went to the park with Salvi, showed Salvi the route she took with Bucaram to his apartment, and identified the address where Bucaram had taken her. *Id.* Salvi testified that the next day she returned to that address, recovered a piece of clothing described by Velez as being worn by Bucaram that day, and noticed two large pieces of luggage. *Id.* at 4-5. She testified that she is aware that later that day Bucaram was arrested and that at the time of his arrest he had his passport and money with him. Salvi further testified that on May 3, 1999, Velez and Villanueva both viewed a lineup and identified Bucaram, and that Flores also viewed the lineup but did not make an identification. *Id.* at 5.

The final witness for the prosecution was a "Detective Gutierrez" ("Gutierrez") who testified that he acted as a Spanish translator for an interview Bucaram had with other police officers and an assistant state's attorney on May 3, 1999. *Id.* Gutierrez testified that during this interview, Bucaram stated that he was in the park on May 1, 1999, when he observed Villanueva by herself and asked her if she was sad. *Id.* at 6. Bucaram told Villanueva she could play with a toy he had in his apartment, and took her to the apartment and closed the door. *Id.* After Villanueva cried,

Bucaram told her that she should not tell her mother what happened, and then gave her a toy; she then kissed him on the cheek. *Id.* Gutierrez, when asked what Bucaram said in the interview about Villanueva leaving his apartment, testified, "I believe at that time she might have been crying." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-85. When Bucaram heard that the police were looking for him, he left the area with his passport and money, intending to go to Ecuador and not return.[4] *See People v. Bucaram*, No. 1-01-0165, slip op. at 6. During the interview Bucaram denied showing "dirty movies" to Villanueva. *Id.*

Leroy Rhodes ("Rhodes"), who owned the house in which Bucaram rented the basement apartment, testified that for two months prior to May 1, 1999, Bucaram was preparing to move back to Ecuador. *Id.* at 7. Rhodes also testified that he did not recall that the television in the apartment had a VCR, and that the building had standard cable service without any "x-rated" channels. *Id.*

Bucaram also testified. He testified that he was in the park on May 1, 1999 when he saw Villanueva in the park and she told him she was sad because her friends were not there. *Id.* Bucaram offered to give Villanueva a toy, which she accepted, and he took

_____

[4]Bucaram contends that this is inaccurate. A review of the transcript of Gutierrez's testimony shows that, when asked whether Bucaram ever indicated whether he intended to return to his apartment after he found out the police were looking for him, Gutierrez testified, "I don't believe he was going back to the apartment." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-32.

her to his residence to give her the toy. *Id.* Bucaram testified that he did not "forcefully" take Villanueva to his home, but only held her hand at the end of the park and later when they crossed a street with a lot of traffic. *Id.* at 7-8. As they were leaving the park, Velez stopped them to tell them that a "black man" was looking for Villanueva. *Id.* at 7. Bucaram testified that Villanueva refused to go with Velez, saying that her parents did not allow her to "associate with black people." *Id.* Villanueva then told Bucaram that they should go to his house quickly because her mother would be mad if she went with him. *Id.* at 8.

Bucaram testified that he and Villanueva were only in his apartment for two minutes. *Id.* He testified that he went in the apartment alone first, and that she then asked him if she could come in, which he allowed. *Id.* He testified that he gave Villanueva the toy immediately after she entered the apartment. She then turned to walk toward the door, which he opened for her because it was tightly closed. *Id.* He testified that he showed her how to use the toy while they were outside in the yard, and that he asked her, "What do you say" and that she replied, "thank you." *Id.* Bucaram denied showing any videos to Villanueva, denied asking her to "make love" or to kiss him on the lips, but testified that he did turn on the television while Villanueva was in his apartment. *Id.* He also testified that after Villanueva told him "thank you" he patted her on the head and told her "that she was

very lovely." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-116. As spelled by the court reporter, Bucaram testified that the words that he used were, "Aros tu amor." *Id.* After Bucaram and Villanueva left the apartment, he testified that he walked with her a short time. *See People v. Bucaram*, No. 1-01-0165, slip op. at 8. Bucaram admitted during cross-examination that he did not know Villanueava or her parents prior to May 1, 1999 and that when he asked Villanueva if she was alone in the park, she replied "yes." *Id.* at 8-9.

Following closing arguments, the court found Bucaram guilty of aggravated kidnapping and indecent solicitation of a child. *Id.* at 9.

### B. State Appellate Procedural History

With the assistance of counsel, Bucaram appealed his conviction, contending that there was insufficient evidence to prove him guilty of the charges beyond a reasonable doubt because there was not sufficient evidence that he "secretly confined" Villanueva or had confined her for a significant period of time as necessary to support the kidnapping conviction, and there was not sufficient evidence that he showed her pornographic movies as necessary to support the indecent solicitation conviction since he offered unimpeached evidence that he had neither a VCR nor access to special cable channels, which impeached Villanueva's unsupported testimony that Bucaram showed her an inappropriate video and asked

her to "make love." The appellate court rejected these arguments, finding that the element of "secret confinement" was met because Bucaram took her to a private residence, hidden from public view and from her parents. *Id.* at 10-11. In addition, the court concluded that even a kidnapping of a few minutes was sufficient to support a charge of kidnapping. *Id.* at 11-12. The court also found there was sufficient evidence to convict Bucaram of indecent solicitation because the trial court was free to credit Villanueva's testimony over the testimony of the defense witnesses. *Id.* at 13-14. Bucaram then filed a *pro se* petition for leave to appeal to the Illinois Supreme Court, raising this and the additional issue that the trial court failed to prove that he had kidnapped Villanueva against her will, and that his appellate counsel failed to properly present this issue on appeal. The Illinois Supreme Court denied his petition for leave to appeal. *See People v. Bucaram*, 202 Ill. 2d 676, 272 Ill. Dec. 360, 787 N.E.2d 175 (2003).

Bucaram subsequently filed a *pro se* post-conviction petition for relief with the trial court. His first set of arguments focus on the lack of evidence to support his conviction. In his petition he generally questioned the logic of his conviction, arguing that Villanueva's testimony did not make sense and suggesting that she had not been truthful. He further contended there was no physical evidence linking him to the crimes for which he was convicted. He

also suggested that the prosecutor had knowingly allowed perjured testimony, arguing that Villanueva committed perjury because she was afraid of punishment. The trial court dismissed his petition, finding it frivolous and without merit under the doctrine of *res judicata* as Bucaram had already challenged the sufficiency of the evidence on direct appeal and lost. *See People v. Bucaram*, No. 99 CR 11735-01, slip op. at 3 (Cir. Ct. Cook Co. Sept. 30, 2003). The court did not address Bucaram's perjury argument.

Bucaram appealed this denial to the appellate court, this time with the assistance of counsel. On appeal he contended that the trial court erred in dismissing his post-conviction petition solely on *res judicata* grounds. Bucaram argued, relying on *People v. McGhee*, 337 Ill. App. 3d 992, 996-97, 272 Ill. Dec. 509, 511-12, 787 N.E.2d 324, 326-27 (Ill. App. Ct. 2003), that a post-conviction petition may not be summarily dismissed on the ground of *res judicata* or waiver. The appellate court affirmed the trial court, finding that *McGhee* and the other cases Bucaram cited in support of his petition were from other appellate divisions and were in conflict with the precedent of that court of appeals that a court may rely solely on *res judicata* to dismiss a post-conviction petition. *See People v. Bucaram*, No. 1-03-3530, slip op. at 2 (Ill. App. Ct. Dec. 23, 2004). Bucaram then filed a petition for leave to appeal to the Supreme Court on the same ground, contending that his petition should be held in abeyance pending the review of

*People v. Leon Blair*, No. 96198, by the Supreme Court.  The Supreme

Court denied his petition.  *See People v. Bucaram*, 216 Ill. 2d 698,

298 Ill. Dec. 381, 839 N.E.2d 1028 (2005).

    C.  Bucaram's Petition for a Writ of Habeas Corpus

    Bucaram subsequently filed the present *pro se* petition for a

writ of habeas corpus.[5]  In his petition he contends that (1) he

was denied his Fifth and Fourteenth Amendment rights because the

prosecution failed to present sufficient evidence to prove his

guilt beyond a reasonable doubt; (2) the prosecution's presentation

was "inflammatory and prejudicial" because of Bucaram's limited

proficiency in English; (3) his conviction was "based on malicious

prosecution"; (4) he was not able to challenge the "Statement of

Facts" which resulted in an unreasonable decision; (5) the

"Appellate Court's decision" was based on an unreasonable

determination of the facts in light of the evidence presented in

the state court proceedings; (6) his trial counsel was ineffective

in not properly impeaching the victim's testimony; and (7) he was

_____

[5]I give Bucaram's petition a generous interpretation because
it was prepared without the assistance of counsel.  *Lewis v.
Sternes*, 390 F.3d 1019, 1027 (7th Cir. 2004) (citing *Haines v.
Kerner*, 404 U.S. 519, 520 (1972)).  I further note that while
Bucaram used an interpreter during his trial and testified in
Spanish, he has filed both the present petition and his reply in
support of that petition in English.  Bucaram has sought the
appointment of counsel in this case, but he has not indicated that
he seeks counsel because of a language barrier.  Because I conclude
that Bucaram's petition is without merit, I need not appoint
counsel or an interpreter to assist him.  Regardless, Bucaram has
no constitutional right to representation for his petition.  *See
Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987).

denied due process of law when the circuit court erred in summarily dismissing his post-conviction petition on the grounds of *res judicata*. In his reply Bucaram appears to raise additional issues, including that (8) his trial counsel was ineffective in failing to cross-examine witnesses and call additional witnesses who would have assisted in his defense, and (9) his appellate counsel was ineffective in failing to raise the ineffective assistance of his trial counsel in this regard; (10) his trial counsel was ineffective in failing to challenge Villanueva's competency to testify; and (11) he wanted a trial by jury.

## II.

The federal statute governing petitions for writs of habeas corpus, 28 U.S.C. § 2254 (2006), provides a "highly deferential standard of review." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (citing *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997)). This standard requires federal courts to give the benefit of the doubt to decisions by state courts, intervening only if a decision is "objectively unreasonable." *Woodford*, 537 U.S. at 24-27. Under the terms of § 2254, a federal court may grant a petition for a writ of habeas corpus only if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the

facts in light of the evidence" presented during the state court proceedings. 28 U.S.C. § 2254(d).

In addition to this deferential standard, a federal court may generally grant a petition for a writ of habeas corpus only where "the applicant has exhausted the remedies available in the courts of the State" and where the applicant has not procedurally defaulted his claims. 28 U.S.C. § 2254(b)(1)(A); *Farrell v. Lane*, 939 F.2d 409, 410 (7th Cir. 1991).[6] These limitations are intended to allow state courts a fair opportunity to hear and act on a petitioner's claims. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999). Procedural default may occur where the petitioner did not comply with state procedural requirements during his appeals in state court such that the state court found those failures to be an "independent and adequate" state law ground for denying his claim. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). When a state court relies on a state procedural ground to avoid reaching the merits of a petitioner's claim, that ground must be clearly and expressly relied upon and must be firmly established and regularly followed. *Braun v. Powell*, 227 F.3d 908, 912 (7th Cir. 2000). To avoid procedural default, a petitioner must, at minimum, "invok[e] one complete round of the State's established appellate review

---

[6]Section 2254 also provides, however, that I may deny a writ of habeas corpus on the merits "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).

process" for each of his claims. *O'Sullivan*, 526 U.S. at 845. In Illinois, this means one full round of appeals up to and including the filing of a petition for leave to appeal to the Illinois Supreme Court. *Id.* at 845-46. *See also Lewis*, 390 F.3d at 1025 (requiring a claim to be raised through one full round of appeals, either on direct appeal of the petitioner's conviction or through post-conviction proceedings, to avoid procedural default).

With this in mind, I examine each of Bucaram's claims below.[7]

A. Proof of Bucaram's Guilt Beyond a Reasonable Doubt

Bucaram's main argument is that the trial court failed to find him guilty beyond a reasonable doubt. He previously raised this issue in state court through his direct appeal following his conviction, so he has not procedurally defaulted on this claim. However, I find that it is without merit.

1. Kidnapping

The trial court convicted Bucaram of kidnapping. Under Illinois law, kidnapping occurs when a person knowingly and secretly confines someone against her will. 720 ILL. COMP. STAT. ANN.

---

[7]In its answer, respondent only acknowledges Bucaram's claims that his guilt was not proven beyond a reasonable doubt, that the decision of the appellate court was based on an unreasonable determination of the facts, and that he was denied the due process of law when the circuit court summarily dismissed his post-conviction petition under the doctrine of *res judicata*, identified as claims 1, 5 and 7 above. This is understandable given that Bucaram's other claims were hidden in his explanation of those three main claims. Because Bucaram has not shown that any of his other claims have merit, it is unnecessary to allow the government further opportunity to respond to the other claims.

5/10-1(a)(1). In the case of someone under 13, as Villanueva was at the time of the offense, "against her will" means that the confinement was without the consent of Villanueva's parent or guardian. *Id.* at 5/10-1(b).[8] Bucaram's main argument is that at trial, the prosecution did not prove asportation (the carrying away of the victim) or that Villanueva was with him for a sufficient period of time to constitute kidnapping. He argues that the evidence showed that Villanueva was only in his apartment for two minutes, and that this is not a sufficient amount of time to rise to the level of kidnapping. He also contends that he never "secretly confined" Villanueva, another necessary element for a charge of kidnapping. However, I agree with respondent that the Illinois state court did not unreasonably apply federal law or make a decision based on an unreasonable determination of the facts, as necessary for me to grant Bucaram's petition on this ground. *See* 28 U.S.C. § 2254(d).

First, Bucaram is correct that the evidence presented at his trial demonstrated that Villanueva was only in his apartment for a

---

[8]Bucaram also argues that Villanueva went to his apartment willingly so that the prosecution did not prove that he took Villanueva against her will. Setting aside the evidence to the contrary, Bucaram has not argued that he took Villanueva to his apartment with the consent of her parents, so his arguments that Villanueva went with him willingly are not relevant to the inquiry. In addition, Bucaram contends that there is no evidence that Villanueva was harmed by his actions. Regardless of whether this is true, it is not relevant to whether the state court's decision was reasonable.

short time.  He testified that she was in his apartment for only two minutes.  *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-115.  While Villanueva herself testified that she did not know how long she was inside his apartment, *Id* at A-27, her description of what occurred also suggested that she was only in Bucaram's apartment for several minutes.[9]  However, the trial court, in finding Bucaram guilty of kidnapping, concluded that it did not matter how long Villanueva was in Bucaram's apartment, because the evidence was clear that Bucaram took her there without anyone knowing where they were going.  Further, the appellate court, in affirming Bucaram's conviction, cited an Illinois case in which the court concluded, citing other Illinois precedent, that kidnapping can occur even when the victim is detained only for a short time. *See People v. Bucaram*, No. 1-01-0165, slip op. at 12 (citing *People v. Ware*, 323 Ill. App. 3d 47, 56, 256 Ill. Dec. 28, 36, 751 N.E.2d 81, 89 (Ill. App. Ct. 2001)).  I can find no precedent holding that this rule is constitutionally deficient in some way, and the appellate court's analysis was based on a reasonable determination of the facts.

Second, Bucaram argues that the evidence was not sufficient to establish that Villanueva was secretly confined.  He argues that

---

[9]This is corroborated by Flores, who testified that he saw Villanueva return to the park about 15 minutes after he saw her walk away from the park with an unidentified man.  *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-54.

although Villanueva was in his apartment, she asked to enter the apartment and was free to leave (although the door leading out of the apartment was closed). The Illinois appellate court, in rejecting this argument when Bucaram made it on appeal, concluded that because Bucaram took Villanueva to his apartment behind closed doors, knowing he would be (and was) alone with her there, and knowing that her parents did not know where she had gone, was sufficient to establish the element of secret confinement. *See People v. Bucaram*, No. 1-01-0165, slip op. at 9-10. Bucaram appears to contend that although the door to his apartment was closed, Villanueva was free to leave. However, he testified that when Villanueva left he opened the door for her; he testified that "the door wasn't locked but the door when it closes it becomes really tight so I had to open it." *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-117. It was not an unreasonable determination for the Illinois courts to conclude, based on this testimony, that Bucaram had secretly confined Villanueva. As with Bucaram's kidnapping conviction, this interpretation of the secret confinement requirement is consistent with Illinois law, and raises no constitutional question. *See, e.g.*, *People v. Mulcahey*, 72 Ill. 2d 282, 285, 21 Ill. Dec. 176, 177-78, 381 N.E.2d 254, 255-56 (1978) ("[S]ecret confinement contemplated by the statute may be

shown by proof of the secrecy of both the confinement and place of confinement, or of either.").[10]

## 2. Indecent Solicitation

Bucaram also contends that there was insufficient evidence to convict him of indecent solicitation of a minor.  Under Illinois law, a person commits indecent solicitation of a child if a person "with the intent that the offense of aggravated criminal sexual assault, criminal sexual assault, predatory criminal sexual assault of a child, or aggravated criminal sexual abuse be committed, knowingly solicits a child or one whom he or she believes to be a child to perform an act of sexual penetration or sexual conduct as defined in Section 12-12 of this Code."  720 ILL. COMP. STAT. ANN. 5/11-6(a).  The Code defines "sexual conduct" in relevant part as "any intentional or knowing touching or fondling by the victim or the accused, either directly or through clothing, of . . . any part of the body of a child under 13 years of age . . . for the purpose of sexual gratification or arousal of the victim or the accused." *Id.* at 5/12-12(e).  Here, the appellate court concluded that

---

[10]As discussed in more detail below concerning the indecent solicitation charge, Bucaram also challenges the credibility of witnesses in suggesting that there was insufficient evidence to convict him.  He challenges the credibility of Gutierrez and his ability to understand Spanish well enough to testify about the statements Bucaram made to the police.  He also challenges Villanueva and Velez's credibility concerning whether Villanueva came into his apartment willingly, and whether he grabbed Villanueva's arm at the park and did not let go.  As discussed in more detail below, I cannot overturn the Illinois court's credibility determinations.

Villanueva's testimony established that Bucaram had asked her to "make love" and asked her to kiss him on the mouth.  She further testified that Bucaram turned on the television and showed her a program depicting a naked man and three naked women.  As the appellate court reasonably concluded, this testimony was sufficient to establish the elements of indecent solicitation of a minor.  *See People v. Bucaram*, No. 1-01-0165, slip op. at 12-13.

Bucaram's arguments in contending that the elements of indecent solicitation were not proven beyond a reasonable doubt focus on the credibility of certain witnesses; he suggests that because the testimony of certain witnesses cannot be believed there was not sufficient evidence to convict him.  For instance, he contends, as he did at trial, that he did not have a VCR or access to cable channels that could have shown the program Villanueva described, and that Villanueva's testimony was an "illusion of her imagination."  He also contends that Villanueva did not speak Spanish very well such that she might have only mistakenly believed that Bucaram asked her to "make love" or "hacer amor."  However, these are all attacks on the credibility of the witnesses.  The trial court chose to believe Villanueva and Velez over Bucaram's account of what occurred, and I cannot substitute its credibility

determinations with my own.  *See Ford v. Ahitow*, 104 F.3d 926, 938-39 (7th Cir. 1997).[11]

For these reasons, I conclude that the Illinois court's determination that Bucaram was guilty of the offenses for which he was charged was not based on an unreasonable application of the law or an unreasonable determination of the facts, so Bucaram's claim is without merit.

B.  Unreasonableness of Appellate Court Decision

Bucaram's second argument, which is linked to his first, is that the appellate court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the "state court proceedings."  For all of the reasons stated above, I conclude that there was sufficient evidence to convict Bucaram of the charges against him, and that the manner in which the appellate court addressed Bucaram's claims was not unreasonable.  Bucaram argues that the appellate court was

---

[11]Bucaram also contends that he did not intend to kidnap Villanueva or to make an indecent solicitation to her.  However, the trial court concluded that he did, and there is evidence to support this conclusion.  There was evidence that Bucaram grabbed Villanueva's arm and prevented her from going to see Flores when Velez told her that Flores wanted to speak with her, that Bucaram turned on a program with naked people and asked Villanueva to kiss him and asked her to "make love" to him, and told her that "little girls" could also "make love," and that Bucaram told Villanueva not to tell her parents what had happened.  It was not an unreasonable interpretation of the facts for the trial court to conclude that Bucaram knowingly kidnapped Villanueva and knowingly made an indecent solicitation to her with the intent of committing one of the offenses enumerated in 720 ILL. COMP. STAT. ANN. 5/11-6(a).

objectively unreasonable in stating "that the State law is no longer in sex offense cases to demonstrate that the victim's testimony be substantially corroborated to prove guilt beyond a reasonable doubt." This is not a valid claim.

In *People v. Schott*, 145 Ill. 2d 188, 164 Ill. Dec. 127, 582 N.E.2d 690 (1991), the Illinois Supreme Court overturned the prior rule in Illinois that a conviction for a sexual offense could not be based solely on the testimony of the victim unless that testimony was clear and convincing or substantially corroborated by other evidence. *See Id.* at 202-03, 164 Ill. Dec. at 133-34, 582 N.E.2d at 696-97 (internal citations omitted). The Illinois Supreme Court instead held that the normal "reasonable doubt" test that applied to all other evidence should apply to evidence based on the testimony of the victim of a sexual offense. *Id.*

Here, the Illinois appellate court, in citing this standard, was merely reciting the governing law in Illinois that the appropriate standard of review of whether there was sufficient evidence to convict Bucaram of the charges was whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See People v. Bucaram*, No. 1-01-0165, slip op. at 13 (internal citations omitted). This standard is a correct statement of Illinois law, is identical to the federal sufficiency of the evidence standard, and presents no constitutional difficulty. *See, e.g., People v. Cox*, 195 Ill. 2d

378, 387, 254 Ill. Dec. 720, 726, 748 N.E.2d 166, 172 (2001)

(setting forth the Illinois sufficiency of evidence standard);

*Schlup v. Delo*, 513 U.S. 298, 330 (1995) (explaining the federal

sufficiency of the evidence standard first set forth in *Jackson v.*

*Virginia*, 443 U.S. 307 (1979)).

## C. The Prosecution's Presentation

In Bucaram's petition he states that "the elements of the

charge were misconstrued as to the Prosecutors [*sic*] presentation

which were inflammatory and prejudicial due to Petitioner's lack of

English language."  Setting aside the fact that Bucaram did not

raise any arguments concerning the prosecution's presentation

(other than the contention in his petition for post-conviction

relief that the prosecutor had allowed perjured testimony), this

contention is without merit.  First, other than Bucaram's

unsupported allegation that the prosecutor allowed perjured

testimony (because, he contends, Villanueva was coached or

otherwise did not tell the truth about what occurred),[12] he

identifies no specific instances of prosecutorial misconduct.  I

have reviewed the trial transcript and can find no instances in

_____

[12]Bucaram insists that Villanueva perjured herself.  A
conviction obtained by the knowing use of perjured testimony is
fundamentally unfair, and must be set aside if there is any
reasonable likelihood that the false testimony could have affected
the judgment of the jury.  *See, e.g.*, *United States v. Agurs*, 427
U.S. 97, 103 (1976).  However, Bucaram has presented no evidence
that Villanueva committed perjury, or that the prosecutor knowingly
used such testimony.

which the prosecutor's presentation was unfairly "inflammatory" or "prejudicial." To make out a constitutional claim for prosecutorial misconduct, Bucaram must show not only that the prosecutor engaged in misconduct, but that the misconduct resulted in a trial that was unfair. *See, e.g.*, *Smith v. Phillips*, 455 U.S. 209, 219-20 (1982); *Richardson v. Briley*, 401 F.3d 794, 800 n.2 (7th Cir. 2005). Here, Bucaram has failed to demonstrate either misconduct or that his trial was unfair, so this claim is without merit.[13]

### D. Malicious Prosecution

In a claim related to his prosecutorial misconduct claim, Bucaram contends that his conviction was based on malicious prosecution. To the extent this claim overlaps with Bucaram's prosecutorial misconduct claim, it is similarly without merit. In addition, setting aside the fact that Bucaram has not previously raised this claim and it appears to be procedurally defaulted, Bucaram has presented no evidence nor even presented any argument why this is the case, so this claim is without merit.[14]

---

[13]In addition, I have reviewed the transcript of Bucaram's trial and see no evidence that the prosecutor committed any misconduct.

[14]Bucaram cannot bring a malicious prosecution tort claim against any of the state actors involved in his prosecution because his conviction has not been reversed on appeal, expunged, invalidated or impugned by a writ of habeas corpus. *See Heck v. Humphrey*, 512 U.S. 477, 486 (1994).

E.  Lack of Opportunity to Challenge Statement of Facts

Bucaram contends in his petition that he was denied the opportunity to contradict the "statement of facts" which resulted in a decision based on an unreasonable determination of the facts. Although this claim is somewhat unclear, Bucaram further contends in his reply that he was denied this opportunity because his trial counsel was ineffective and because, during the post-conviction proceeding when he represented himself, of his own difficulty communicating in English and of his inability to obtain representation during the post-conviction proceeding. Bucaram's ineffective assistance arguments are addressed below. To the extent this claim hinges on his inability to challenge the statement of facts during the post-conviction proceeding, this is not a cognizable claim.

Unless some aspect of state collateral review violates an independent constitutional right, errors in state collateral review cannot form the basis for federal habeas corpus relief. *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) (internal citations omitted). Here, Bucaram's alleged inability to challenge the statement of facts during the post-conviction proceeding violates no independent constitutional right. As the Supreme Court has already ruled, because states have no obligation to provide post-conviction proceedings, litigants who choose to collaterally attack their conviction through post-conviction proceedings have no right

to counsel during those proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1990) (citing *Ross v. Moffitt*, 417 U.S. 600, 614-15 (1974)). Further, Bucaram's claim that he was unable to effectively challenge the statement of facts because he is not fluent in English is also without merit; courts have previously held that a litigant's unfamiliarity with English does not excuse him from complying with procedural requirements during a state post-conviction proceeding. *See Henderson v. Cohn*, 919 F.2d 1270, 1272 (7th Cir. 1990) (collecting cases). Therefore, this claim cannot provide him with habeas relief.

F. Due Process/Post-Conviction Petition

Bucaram next argues that he was denied his right to due process of law when the Illinois state court summarily dismissed his post-conviction petition on *res judicata* grounds. When Bucaram filed his post-conviction petition arguing, as on direct appeal, that the evidence presented during his trial did not support his conviction, the trial court dismissed the petition, finding it barred by the doctrine of *res judicata* since Bucaram had already lost this argument on direct appeal. *See People v. Bucaram*, No. 99 CR 11735-01, slip op. at 3. However, Bucaram has not stated a valid claim. This is not because, as the respondent argues, it involves a question of state procedural law. Merely because Bucaram has no right to a state post-conviction hearing does not mean that, once the state chooses to provide such a hearing, the

state may act arbitrarily. *See, e.g.*, *Allen v. Duckworth*, 6 F.3d 458, 459-60 (1993) (noting that a state is not permitted "with one hand to grant [the right to an appeal] and with the other to take it away in an arbitrary fashion"). Here, however, there is no cognizable argument that it violated Bucaram's right to due process for the Illinois state court to apply the doctrine of *res judicata* to post-conviction petitions; this is not fundamentally unfair. *See Brecht v. Abrahamson*, 507 U.S. 619, 639 (1993) (Stevens, J., concurring) ("The Fourteenth Amendment prohibits the deprivation of liberty 'without due process of law'; that guarantee is the source of the federal right to challenge state criminal convictions that result from fundamentally unfair trial proceedings."). Therefore, this claim is without merit.

G.   Ineffective Assistance of Counsel/Failure to Impeach Victim

For the first time in his reply in support of his petition, Bucaram raises a series of ineffective assistance of counsel claims. Specifically, he contends that his trial counsel was ineffective for failing to impeach Villanueva, failing to challenge Villanueva's competence to testify, and failing to cross-examine witnesses effectively and failing to call additional witnesses who could have assisted Bucaram's defense. He further contends that his appellate counsel was ineffective for failing to raise his trial counsel's ineffectiveness in cross-examining and failing to call additional witnesses. Bucaram did not raise any of these

ineffective assistance arguments on direct appeal or in the post-conviction proceedings in state court, so they are procedurally defaulted. This means that I may only consider these claims if Bucaram can show cause for the default and actual prejudice as a result of the prosecutor's actions, or demonstrate that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. I find that Bucaram cannot show cause for failing to raise these claims with the state court. Bucaram does generally contend that his lack of counsel and lack of English proficiency prevented him from presenting his case as well as he would have liked during the post-conviction proceedings. However, courts have been clear that neither lack of counsel nor inability to communicate in English constitute cause. *See Harris v. McAdory*, 334 F.3d 665, 668 (7th Cir. 2003) (holding that *pro se* status during post-conviction proceedings is not cause for procedural default)*; Henderson*, 919 F.2d at 1272 (collecting cases holding that inability to read or write English does not constitute cause).

Because I find that Bucaram cannot show cause for failing to raise these claims, I need not consider whether he can show prejudice. I do need to consider whether failing to consider his ineffective assistance of counsel claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. A showing of a fundamental miscarriage of justice requires a showing

that, in light of new evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *House v. Bell*, 126 S. Ct. 2064, 2076-77 (2006) (quoting *Schlup*, 513 U.S. at 324)). Here, Bucaram has not met this burden. Bucaram has raised numerous arguments about actions he believes his counsel should have taken.[15] However, although he has presented new arguments, he has not presented new evidence from which I can conclude that it is more likely than not that no

---

[15] For example, Bucaram contends that his counsel should have cross-examined Villanueva more vigorously to establish that she was not telling the truth, that she voluntarily went to his home, and that the police coached her or suggested to her what she should say occurred. He argues that his counsel should have challenged Villanueva's competency to testify, and should have called a psychiatrist and Villanueva's parents to testify to undercut her credibility. He further argues that his counsel should have called various other witnesses, including a police officer to verify that the police did not seize a VCR from his home (to establish he could not have shown Villanueva a program depicting naked people as she described), and the laundry lady who worked near his apartment who Bucaram contends could have cleared up inconsistencies concerning his intent to flee the country after learning the police were looking for him. He further argues that his counsel should have more vigorously challenged Gutierrez's proficiency in Spanish and the differences between the Spanish spoken by people from Ecuador and Mexico. Without going into detail, some of the things that Bucaram contends his counsel should have done are things his counsel actually did. For instance, his attorney did question Villanueva on cross-examination about whether she had been warned about going with strangers, and about how she would not have wanted to be in trouble that afternoon. *People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-26. He also did elicit from Salvi that the police had not recovered a VCR from Bucaram's apartment. *Id.* at A-64. He further had Bucaram's landlord testify concerning what kind of cable Bucaram had in the apartment. *Id.* at A-102-03. He also questioned the translator about whether there were differences between Spanish spoken in Ecuador and Mexico. *Id.* at A-97.

reasonable juror would have convicted him. *Id.* He has not even shown that any of the steps he wishes his counsel would have taken would have actually uncovered new evidence that would have assisted in his defense. For these reasons, I cannot consider his ineffective assistance claims.

## H.  Jury Trial

Finally, Bucaram states in his reply in support of his petition that he wanted a jury trial instead of a bench trial. Bucaram did not raise this argument before the Illinois state court, so it is procedurally defaulted. Setting  this aside, however, Bucaram has presented no evidence that he was denied his right to a jury trial. The right to a trial by jury is protected by the Sixth Amendment, and any waiver by a defendant of this right must be knowing and voluntary. *See Milone v. Camp*, 22 F.3d 693, 704 (7th Cir. 1994) (citing *Brady v. United States*, 397 U.S. 742, 748 (1970)). Here, the record indicates that Bucaram knowingly and voluntarily waived his right to a jury trial prior to the start of his trial. With the assistance of an interpreter, Bucaram had the following exchange with the court:

> THE COURT: All right, Mr. Bucaram, you just signed a document entitled a jury waiver. A jury trial is where twelve people are selected to listen to the evidence and then decide the question of innocence or guilt after they hear all of the evidence. You have a right to a jury trial, do you understand that?
>
> THE DEFENDANT: I said I wanted to have the trial with a Judge not with twelve persons.

> THE COURT: I am just explaining to you that you have a right to a jury trial, do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: By signing this piece of paper you are indicating in writing that you wish to give up your right to have a jury trial and you want me to decide the question of innocence or guilt. Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: All right. Okay, we'll accept the jury waiver.

*People v. Bucaram*, No. 99 CR 11735, Report of Proceedings, at A-3-4. In this colloquy Bucaram appears to voluntarily and knowingly waive his right to a jury trial. He has presented no additional information to this court that calls this waiver into question. Therefore, this claim is also without merit.

III.

For the above reasons, I deny Bucaram's petition for a writ of habeas corpus.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: May 30, 2007